DECISION
Plaintiffs appeal the 2009-10 real market value of property identified as Account R523179 (subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on November 17, 2010. W. Scott Phinney, Attorney at Law, appeared for Plaintiffs. Richard Miller (Miller), owner of Affinity Property Management and manager of the subject property, and Richard M. Bean (Bean), principal broker, Rose City Commercial Real Estate, testified on behalf of Plaintiffs. Jacquilyn Saito-Moore, Assistant County Counsel, appeared for Defendant. Jim Sanders (Sanders), Senior Commercial Appraiser, Washington County Department of Assessment and Taxation, testified for Defendant.
Plaintiff's Exhibits 1 through 8 and Defendant's Exhibits A through F were received without objection. Defendant's Exhibits G through K were received with objection. Defendant requested that the words "and one additional sale in Clackamas County" be stricken from its Exhibit G at 18.
At the close of the trial, the parties agreed to file written closing statements no later than close of business on December 17, 2010. *Page 2 
 I. STATEMENT OF FACTS
Miller, a manager of 35 multi-family buildings located in Portland and Eugene, testified that the subject property, known as Riverwood Heights, is a 240 unit apartment complex with access off Highway 99 in Tigard, Oregon. He testified that the subject property is a "B property in a B location." Sanders described the subject property:
 "Fourteen two-to-three story wood frame apartment buildings with a total of 240 units, separate garage and carport structures, and a separate recreation building with an outdoor [and indoor] swimming pool. This development ranks as a good quality constructed project, which was completed in 1990. The unit mix includes 48 one bedroom/one bathroom 700sf units; 52 two bedroom/one bathroom 880sf units; 92 two bedroom/two bathroom 915sf units; and 48 three bedroom/two bathroom 1,150sf units. Riverwood Heights occupies a site of 9.98 acres."
(Def's Ex G at 3.)
Miller reviewed Plaintiff's Exhibit 1, page 4, "Market Survey" and Exhibit 1, pages 7 through 9, "Profit and Loss Variance." He testified that "rents" for the subject property have "increased, but expenses have increased faster than rents." Miller continued stating that the rents for the subject property are "slightly below competition" and the subject property's main competitor, Avalon Park, recently completed a $4 million renovation. He explained that to achieve the "goal of 95 percent occupancy" rent concessions were "used more than he would like." Miller acknowledged that as of December 20, 2008, the subject property's "occupancy rate was 94.5 percent." (See Ptf's Ex 1 at 4.) Miller testified that "utility (water, sewer, gas) rebilling (RUB revenue) is common way to "pass on costs to the residents." He explained that expenses recorded in the "6000 series" accounts are "classified as expenses or capitalized by the accountant." *Page 3 
Miller testified that the subject property "at its peak" would not have sold for Defendant's 2009-10 real market tax roll value of $21,360,480. (Def's Ex A at 2.) He continued, stating that, in August 2007, "credit froze" and, in 2009, the "market was seized." Sanders did not agree that the "downturn in the economy" had the same effect on the value of "apartments" as it did on the value of "retail and office campuses." He explained that "apartment rents have increased" with no significant "increases in vacancy rates." Sanders acknowledged that there has been "a bit of a lull in apartment sales." Plaintiff referenced Defendant's Exhibit J. page 2, stating "a decline in [apartment] value of 15% to 18% from the peak in early 2008." Sanders testified that a source reported that those "declines appear[ed] more pronounced for newer larger complexes and more outlying suburban communities, and less pronounced in the urban area and close-in area just outside of the urban core." (Id.) Miller testified that the subject property has "always been a more challenging project," explaining that few prospective residents are interested in "carrying a couch up three story flights of stairs." He concluded that the subject property has "always been a little below the market," and in managing the subject property, or any property, the goal is to "push rent, and hold expenses."
Bean, a commercial real estate broker for five years, testified that, for a commercial property investor, "NOI" (net operating income) is most important because it "measures the power of the economic engine." Bean stated that investors are interested in the future stream of revenues, "want the cash flow," "long term appreciation," and "tax benefits." He reviewed Plaintiff's Exhibit 1, page 6, "Capitalization of Income into Value," describing how the value of each line item was determined. Bean testified that in determining a capitalization rate (9.75 percent) he "compiled various sources" and was influenced by the U.S. financial market *Page 4 
crisis occurring in September 2008. (Ptf's Ex 1 at 4; 51.) Bean testified that he did not select any properties sold "before September 17, 2008, because "it's not appropriate" and admitted that he only visited one of the properties. He testified that the capitalization rate included a property tax rate of 1.5 percent, a rate "when the property goes into compression." Sanders referenced an IRR-MarketPulse 2008, Q4 Report that was prepared by Integra Realty Resources — Portland when he stated that the capitalization rate for "Class B" multifamily property was "6.7 percent" which was an increase from the prior report. (Def's Ex H.) He also referenced Norris and Stevens Apartment Investors Journal, stating that the "CAP Rate Ranges" for "larger apartment communities [20 or more units] sold 01/08 — 01/09" in Washington County for apartments built in "1990 to the present" ranged from "5.89 percent to 7.65 percent." (Def's Ex K at 6.) Plaintiff asked about the timing of data used in a "4Q 2008" report, suggesting that, for an assessment date of January 1, 2009, it would be "better to use" the first or second quarter 2009 report. Plaintiff stated that the second quarter 2009 report showed a capitalization rate for Class B multifamily properties of seven percent. Bean testified that the capitalization rate "came from various sources" but primarily the comparable properties' sales analysis including properties located in Vancouver, Washington, but not Salem, Oregon because Vancouver is the "same economic area" like Portland. Bean's indicated value for the subject property for the 2009-10 tax year was $14,600,000 (rounded.) (Ptf's Ex 1 at 6.) He characterized the indicated value as "being conservative, at the high end."
Bean testified that he "verified the value" through comparable sales to ensure that it passed the "laugh test." (Ptf's Ex 1 at 68 through 76.) He commented that, in looking for comparable sales, there was "little market data because investors stopped buying." Bean *Page 5 
testified that he excluded "Section 1031" transactions from among his comparable sales. When asked by the court why he included "Wellington Estates" when CoStar reported "sale conditions: 1031 exchange," Bean did not remember his testimony. (Ptf's Ex 1 at 70.) He reviewed the characteristics of each of the four properties (The Collonnade, Wellington Estates, Pacific Crest, and Willow Springs) and testified that he visited all properties identified as comparable to the subject property. Bean was asked and he confirmed that he knew that Willow Springs was a "low income housing, section 42" property with a "ceiling on rents" and that Pacific Crest was developed in two phases, the first phase in 1969 and the second phase in 1974. Bean computed a ratio of the "NOI per square foot" of each property he identified as comparable to the subject property's "NOI per square foot." (Ptf's Ex 1 at 69.) Using that ratio, he computed an adjusted unit price and price per square foot. (Id.) Bean testified that it is "atypical" that the indicated value based on per unit, $14,746,199, and indicated value based on per square foot, $14,739,412, are so close and each indicated value "suggest that $14,600,000 is in the ball park." (Id.) Sanders challenged the comparability of the four properties' net operating income to the subject property. He reviewed the characteristics of each property, noting the difference between each property and the subject property, specifically the unit mix and year built.
Bean concluded his testimony by reviewing his resume and discussing various articles that he acknowledged contained no specific reference to Washington County, Oregon. (Ptf's Exs 3, 5, 6, 7, and 8.)
Sanders, who has been employed 15 years by Defendant and currently supervises seven commercial appraisers, testified that Defendant's opinion of value, $21,500,000, for the subject *Page 6 
property is supported by the three approaches to valuation, cost, income and sales comparison or market. (Def's Ex G.) Sanders reviewed the cost approach, testifying that the improvement cost was "developed using the Marshall Valuation Service computerized Commercial Cost Estimator in conjunction with Marshall's Valuation Services publication." (Id. at 27.) He stated that the "[i]mprovement valuation in the Cost Approach involves estimating the reproduction cost as of the effective date of the appraisal, less allowances for depreciation due to physical deterioration, functional obsolescence, and external obsolescence." (Id. at 26.) Sanders acknowledged a typographical error on Defendant's Exhibit G, page 31, for the actual age of the subject property; it should read 19, not 15 years. Sanders testified that "[v]aluing a land parcel is generally best accomplished by direct sales comparison analysis" and "[f]our sales in Washington County" were "selected." (Id. at 18 through 22.) He reviewed each land sale, concluding that $12.90 per square foot was supported by the four sales and determining a land value of $5,608,000. (Id. at 26.) Plaintiff challenged whether the four sales were "arms length" and asked about zoning, lack of time adjustment, and Sanders' "subjective" adjustment for the "superiority" of the land sale property to the subject property. To the determined land value, Sanders added the improvement value of $18,995,220 for a total property value indicated by the cost approach of $24,603,000 (rounded.) (Id. at 26; 31.)
Sanders moved to the sales comparison approach. (Id. at 32 through 37.) In selecting five property sales comparable to the subject property, Sanders testified that he confirmed all sales, considered the "unit mix," year built, and similar amenities, including detached garages, club house, sport court, children's play area and pool, and inspected each property. He outlined the defining characteristics of the subject property: no interior enclosed hallways; wood frame *Page 7 
construction; some three story buildings; maintained exterior. (Id. at 59 through 66.) Sanders reviewed each of the comparable sale properties. He concluded
 "[a]fter taking the renovations into consideration and placing primary weight on Comparable Sales Two [Brightwaters at Redhawk] and Four [Westbury Apartments], it is appropriate to select a market indicator from the lower end of the range value indicators[.] * * * Because unit sizes vary significantly among apartment developments, the value/sf method of valuation more accurately reflects an apartment development's market value, compared to the value/unit method[.] * * * [W]ith primary weight given to the value/sf method, the estimated market value for the Subject Property via the Sale Comparison Approach is $23,500,000."
(Id. at 37 (emphasis in original).)
Sanders discussed the income approach which he defined as "applying a capitalization rate to convert the annual net income generated by a commercial property into an estimate of market value." (Id. at 38.) He testified that he selected five "rent comparables" within the subject property's immediate area and concluded that that the subject property's rents are "lower" than its competition. (Id. at 38 through 42.) Sanders computed market rents in excess of those reported for the subject property, concluding that the market rents fell "closely in line with these actual rents." (Id. at 42.) He computed "other income"[1] at "eight percent of the potential gross rent income," relying on "actual historical data to calculate other income." (Def's Ex G at 42.) To compute a vacancy percentage of 5.25 percent, Sanders relied on a "survey of similar properties, as well as an analysis of this property class." (Id. at 43.) When asked if the vacancy percentage included rent concessions, Sanders responded that he interviewed apartment managers to confirm vacancy rates and vacancy is a term "understood" by those who manage apartments. Sanders testified that, after reviewing Washington County's annual expense ratio study for apartments, he computed an expense ratio of 35 percent that recognizes the subject *Page 8 
property's lack of recent interior upgrades. (Id. at 43.) In arriving at a capitalization rate, Sanders testified that he considered the market capitalization rates of the four sales he designed as comparable properties and other national and regional sources. (Id. at 43 through 44.) He concluded that "a capitalization rate of 6.5% is considered reasonable [and] 1.0% is also added to the capitalization rate to account for taxes. The 1.0% is based on countywide tax comparisons done annually for all apartment properties." (Id. at 43.) Sanders concluded that the "market value of the Subject Property indicated by the Income Approach is:$20,590,000 (rounded." (Id. at 44 (emphasis in original).)
Sanders testified that he reconciled the three "indicated values utilizing each approach." (Id. at 45.) He stated:
 "The Income Approach is assigned the greatest weight in the reconciliation based on the reasoning given in the comments above. Slight secondary weight is given to the Sales Comparison Approach. The Cost Approach lends additional support. In conclusion, the indicated market value for the subject property as of January 1, 2009 is:
 Improvements $15,892,000
 Land $5,608,000
 Total Market Value $21,500,000"
(Id. at 45 through 46 (emphasis in original).)
He requested that the court "sustain" the tax roll value of $21,360,480.
 II. ANALYSIS
The issue before the court is the real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Page 9 Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A. Highest and Best Use
Prior to reviewing the parties' approaches to valuation, the highest and best use of the subject property must be considered. Both parties agree that the current use of the subject property as an apartment is legally permissible.
B. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR150-308.205-(A)(2). Even though there have been statutory language changes, "the fundamental [real market] value definition has been consistent for many years * * *." Chart Development Corp v. Departmentof Revenue (Chart), 16 OTR 10, 12 (2001): Portland CanningCo. v. Tax Com., 241 Or 109, 113, 404 P2d 236 (1965); see also
OAR 150-308.205-(A). Real market value as defined above "should be distinguished from other definitions. It is the value based on market worth rather than investment expectation or insurance value.See Appraisal Institute, The Appraisal of Real Estate, 20-21 (12th ed 2001)." Chart at 12. Plaintiff determined the subject property's real market value using a modified income approach that was investor focused. Plaintiff's modified investment approach does not necessarily determine a value "based on market worth." Id.
There *Page 10 
is no evidence showing that Plaintiff's approach determined a real market value based on the market.
ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:
 "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."
Plaintiff's market approach did not adjust any of the identified properties to the subject property, nor did Bean verify any of the market transactions to "ensure they reflect arms-length market transactions." Plaintiff's market approach does not fulfill the statutory requirement to determine value using the methods and procedures adopted by the Oregon Department of Revenue's administrative rules and will not be given any weight by this court.
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief." ORS 305.427. (emphasis added). Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence."Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citingFeves v. Dept. of Rev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." Poddar v. Dept. of Rev.,18 OTR 324, 332 (2005) (quoting Woods v. Dept. of Rev.,16 OTR 56, 59 (2002) (citation omitted.)
Plaintiff presented one approach to value, a modified income approach that was investor focused. There was no evidence that that approach met the statutory requirement to determine *Page 11 
the subject property's real market value as of the assessment date. Plaintiff's market approach failed to follow the Department of Revenue's administrative method and procedures set forth in OAR 150-308.205-(A)(2)(c). Because Plaintiff's modified income approach and market approach do not fulfill the statutory requirements of acceptable methods to determine real market value, Plaintiff failed to carry its burden of proof.
 III. CONCLUSION
After careful consideration of the evidence, the court concludes that Plaintiff failed to carry its burden of proof. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is dismissed.
Dated this ___ day of February 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron February 28, 2011. The Court filed and entered this documenton February 28, 2011.
[1] Sanders stated that other "[i]ncome may come in the form of garage/carport rent, late fees, pet fees, etc." (Def's Ex G at 42.)
[2] References to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2007. *Page 1